UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL FILE NO.: 1:22-cv-776

| | |
|---|---|
| Andrea Walker, )<br>Plaintiff, )<br>v. )<br>Thomas J. Vilsack, Secretary of )<br>Agriculture, )<br>Defendant. ) | **COMPLAINT**<br>Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.; Civil Rights Act of 1964 as amended, 42 U.S.C. 2000(e).<br>(Jury Trial) |

Now comes the Plaintiff complaining of the acts of the Defendant and alleges and says as follows:

1. This action is brought pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq. and the Civil Rights Act of 1964 as amended, 42 U.S.C. 2000(e). This action seeks to redress unlawful employment discrimination which resulted in acts which are prohibited under these statutes and regulations.

2. Plaintiff, Andrea Walker is a citizen of the United States and is a resident of Forsyth County, North Carolina. (Plaintiff is also referred to herein as Dr. Walker.)

3. The Defendant, Thomas J. Vilsack, Secretary of Agriculture is and was the Secretary of Agriculture during the relevant times contained in this complaint and as such is the head of a department, agency, or unit of the Federal Government, namely, the United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS). (The defendant is also referred to herein as the Agency).

4. The Plaintiff brings this action alleging that she was discriminated against because of her disability and in retaliation for her complaints of disability discrimination.

5. Plaintiff filed a formal complaint with United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS).regarding the issues raised herein, bearing USDA Complaint No.: FSIS-2020-00942.  The final agency decision was mailed to plaintiff on June 16, 2022.  Plaintiff has filed this present action within ninety (90) days of her receipt of the final agency decision.

6. Plaintiff was, at all times pertinent to the allegations of this present action, an employee of the United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS). She held the position of a Public Health Training Coordinator (GS-0701-13) within the Office of Employee Experience and Development (OEED), Center for Learning, Training Management Branch, located in Washington, District of Columbia (DC). She had been in the position since March 2015 and employed by the defendant United States Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS) since June 5, 2011.

7. Plaintiff, Andrea Walker is a Doctor of Veterinary Medicine.  She graduated from Tuskegee University, School of Veterinary Medicine in 1998. She has actively practiced as a veterinarian in both the private and public sector since her graduation from Tuskegee University.

8. Dr. Walker has been employed by the United States Department of Agriculture, Food Safety Inspection Service (hereinafter FSIS or Agency) since 2011. She worked as a Supervisory Public Health Veterinarian (SPHV) in the Office of Field Operations (OFO) from 2011 through 2015.

9. Stephanie Wilkins has been Dr. Walker's second level supervisor since 2015. She is the Chief Training Officer, Office of Employee Experience and Development, Center for Learning. She also served as Plaintiff's interim supervisor at the end of fiscal year 2019.

10. Dr. Hala Bessyoung is the Branch Chief of the Office of Employee Experience and Development, Center for Learning, Training Operations Branch. She served as Plaintiff's supervisor for a brief time in 2019.

11. Jennifer Webb is the Branch Chief of the Office of Employee Experience and Development, Center for Learning, Training Management Branch. She has been Plaintiff's first level supervisor since October 2019.

12. Dr. LaRia Robinson was Plaintiff's first line supervisor from March 2015 until the Fall of 2019. Laria Robinson stepped down from her supervisory role in fiscal 2019.

13. In 2015, Dr. Walker was promoted to the position of Public Health Training Coordinator, GS-13. At that time she was assigned to the Dallas District as her duty station.

14. During 2017, Dr. Walker was diagnosed with Lyme disease and with attention deficit hyperactivity disorder (ADHD). This disease had a devastating effect on her physical, mental, and emotional well-being. The Lyme disease caused the following problems: difficulty walking, blurry vision, chronic fatigue, insomnia, swelling of large joints, numbness and tingling of extremities, difficulty standing for

long periods of time, problems with finishing sentences, losing train of thought, problems with focus, and having difficulty recalling information.

15. As a result of the complications from Lyme disease, Dr. Walker sought and was initially denied, a hardship transfer request from the Dallas area to North Carolina, in an effort to receive adequate treatment from "Lyme Literate" medical doctors (LLMDs). Dr. Walker's treating physician supported the transfer request with a letter that stated that "Andrea Walker will need to be treated by a "Lyme Literate" medical doctor on a consistent basis to get condition under control and a better chance at going into remission."

16. In the July 6, 2018 letter, the treating physician also stated that the agency should "allow Dr. Walker to work from home as needed when fatigued or when having flare ups."

17. As a result of the Lyme disease, Dr. Walker sought reasonable accommodations and was granted certain reasonable accommodations on July 13, 2018 while in the Dallas location.

18. Dr. Walker also filed an EEO grievance of the decision to deny her transfer request. To resolve the grievance Stephanie Wilkins was forced to allow Dr. Walker to transfer to the USDA Headquarters in Washington, D.C. The grievance itself is curiously missing from the investigation file but is referenced multiple times. Most notably, on a timeline produced by the agency, it states that Dr. Walker "relocated from Dallas to Washington, DC as part of a resolution to a previous complaint."

19. The relocation from Dallas, Texas to Washington, D.C. was forced on the agency in the Summer of 2019, but plaintiff remained in the Dallas location as her duty station until the Fall of 2019. During the time that plaintiff remained in Dallas, Stephanie Wilkins became her supervisor, because Dr. LaRia Robinson stepped down as a supervisor. While plaintiff was still in Dallas, Stephanie Wilkins became her supervisor out of the FSIS Headquarters in Washington, D.C.

20. Stephanie Wilkins was directly involved in the EEO grievance process and in fact, it was Wilkin's decision to initially deny the transfer request that was overturned as a result of the EEO grievance that Walker filed.

21. It was around the same time, the latter part of 2019, that Stephanie Wilkins issued to Dr. Walker the first "not meet satisfactory" performance rating that Dr. Walker had ever received. Although Stephanie Wilkins had not been the direct supervisor for more than 30 days, she issued an unsatisfactory performance rating to Dr. Walker in retaliation for being forced to accept her transfer request as a reasonable accommodation.

22. Shortly thereafter, the agency began to use Stephanie Wilkins' performance appraisal as an excuse to deny to Dr. Walker the reasonable accommodations that had already been approved.

23. On November 4, 2019, in an email from Dr. Bessyoung, and Wilkins, the agency cancelled the telework accommodations that had been implemented in 2018 as a reasonable accommodation for Dr. Walker. Dr. Bessyoung had not been Dr. Walker's supervisor until immediately before sending this email to cancel the telework

accommodation, and ceased being the supervisor immediately after sending the email that canceled the telework accommodation. Shortly thereafter, Dr. Walker was reassigned under Webb's supervision. The excuse given for the cancellation of the telework accommodation was the issuance of the "not meets satisfactory" performance rating that Wilkins had issued a few weeks earlier.

24. So, in summary, after being forced to accommodate Dr. Walker by allowing her to transfer to the FSIS D.C. headquarters, Wilkins issued both a "not meets satisfactory" performance rating and revoked Dr. Walker's telework accommodations.

25. During this period of time between November and December of 2019, Dr. Walker relocated from Dallas, Texas to Washington, D.C., while continuing to perform the duties of her position.

26. As part of the approved reasonable accommodation that was approved in July 2018, it was understood that due to her medical condition, Dr. Walker may need to request extensions on some deadlines. In the original accommodation, Dr. Walker stated that due to her medical condition, "I may need extended deadlines on projects and tasks. I will notify [supervisor] of any specific needs prior to the stated deadline." The accommodation, as approved, stated that "if you are unable to meet a specific task assigned by a supervisor, notify the supervisor prior to the stated deadline." The accommodation also stated that "For large projects or assignments, I agree with dividing them into several small tasks and getting clarification, when necessary. You

may still be able to meet the deadline. If not, notify the project coordinator and/or supervisor prior to the deadline."

27. The approved reasonable accommodation provided for situations when, due to the nature of Dr. Walker's medical condition, she may need to request extensions of deadlines. The reasonable accommodation was accepted and put in place in July 2018, while she was still assigned to the Dallas District office.

28. When Dr. Walker moved to the Washington, D.C. office, the management completely ignored any, in fact, refused to provide reasonable accommodation.

29. Dr. Walker's first day at the DC office was during the first two weeks of December 2019. Dr. Walker was required to physically report to the office in Washington, D.C. each and every day. Dr. Walker's office was next to Jennifer Webb, her new supervisor and within the same as Stephanie Wilkins. There were days that Dr. Walker would be the only one in the FSIS DC office because everyone else was allowed to telework, particularly as the COVID epidemic infection rate continued to rise. Dr. Walker was not allowed to telework until the president issued an order closing all of the federal buildings.

30. The telework accommodation was not the only accommodation that management refused to acknowledge and implement. Shortly after her transfer to Washington, D.C., Dr. Walker was advised that she had to begin the reasonable accommodation process all over again by submitting medical documentation that would support her reasonable accommodation request. Dr. Walker attempted to comply, but with just relocating to Washington, D.C. and trying to find a "Lyme

7

literate" medical doctor, it was difficult to find a physician that would provide the documentation to start the medical evidence all over again. Dr. Walker reached out to Mr. Benjamin Tate in July 2020, a reasonable accommodation counselor, who was involved with her initial approval of reasonable accommodation in July 2018. Mr. Tate advised Dr. Walker that she did not have to start the medical documentation process all over again and that the agency was required to comply with her approved reasonable accommodation that was on file. He stated that, "We do have your RA request from FY18 on file and we will continue to use that documentation. We will not require you to submit any additional medical documents at this time …".

31. At the agency's request, Dr. Walker's new physician in Washington, D.C. completed a FSIS Form 4306-5 on April 6 2020 titled "Medical Documentation For Employee's Reasonable Accommodation Request." In the form, the physician specifies the following accommodations: "Flexible Schedule"; "Telework"; and "extended deadlines", among others.

32. The agency completely ignored the April 2020 medical documentation, as well as the medical documentation from the physicians in 2018 that established the original accommodations.

33. Instead, the supervisor, Jennifer Webb, issued a "Leave Restriction Letter" to Dr. Walker for reasons related to her disability. The letter states: "You are expected to work an 8 hour work schedule for Monday through Friday between the hours of 8:30 to 5 PM. Changes to your proposed work schedule under Maxiflex will be granted only if you successfully completed a proposed work schedule prior to the pay

period for which you are requesting the change and only if your supervisor has agreed. During the pay periods when you are teaching classes virtually, CFL may allow changes to your work schedule provided that the changes are agreed upon in advance. No Saturday and Sunday work as telework time will be approved."

34. The Leave Restriction Letter further states that; "Sick leave will be granted only if you provide an acceptable medical certificate. This certificate must include a written statement (on a physician's or practitioner's letterhead, including address and telephone number) signed by a practicing physician or other practitioner certifying to the incapacitation, treatment, and the period of disability or incapacitation. This certification is to be provided to your supervisor immediately upon your return to work, at the start of your tour of duty. Failure to provide the proper certification will result Absence Without Official Leave (AWOL) charges."

35. The leave restriction letter further states that, "Annual leave in lieu of sick leave will require the same certification as stated above in addition to official approval by the supervisor."

36. The leave restriction letter is discriminatory, per se.

37. Jennifer Webb then followed the letter with a series of harassing emails all directed toward Dr. Walker's requesting 'unscheduled' and "intermittent" leave due to her medical illness.

38. In furtherance of this discriminatory and harassing treatment of Dr. Walker, on September 4, 2020 Webb informed Dr. Walker that she was being placed on a 30-day Demonstration Opportunity and on September 25, 2020 informed Dr.

Walker that she failed to successfully complete the Demonstration Opportunity. Webb then used the allegedly failed demonstration opportunity, as a basis to issue a Notice of Proposed Removal.

39. Despite management's harassment, Dr. Walker continued to press for the FSIS to acknowledge and implement her reasonable accommodation request. Finally, because of Dr. Walker's persistence, the agency issued an approval of her accommodation request, signed by Wilkins on September 30, 2020. But curiously, the record only contains the form that has been signed by Wilkins, but not the accommodations that the form indicates are listed on the "attached" list.  The form states that the accommodations are effective "immediately" but will be revisited in "90 days",  but within 33 days of the forced approval of the reasonable accommodations, Wilkins and Webb issued a Notice of Proposed Removal, as further discrimination and harassment of Dr. Walker because of her disability.

40. On November 2, 2020, in furtherance of this discriminatory and retaliatory treatment of Dr. Walker, Webb issued a notice of proposed removal. These allegations were refuted by Dr. Walker in a 266-page document that was filed in response to the proposed removal.

41. The Notice of Proposed Removal was rescinded by the Labor and Employee Relations Division (LERD) after Dr. Walker's rebuttal statement.  But, no reason was given to Dr. Walker for the rescission, although it is clear that it was a result of Walker's documentation of the falsity of the allegations in the notice of proposed removal.

42. On November 8, 2020, the Agency issued Dr. Walker another Leave Restriction Letter. The letter states that it is being issued because Dr. Walker's "sick leave usage was excessively unplanned, frequent, and repetitive."

43. The agency requested that Dr. Walker's records be reviewed to determine the extent of her medical condition and the limitations it may pose on her ability to perform the position with or without reasonable accommodations. In response the agency was advised that "the medical documentation suggests that Walker's limitations are variable and intermittent, exacerbated during flare-ups or periods of fatigue." It states:

> The medical documentation provided states that Ms. Walker suffers from the following medical conditions: Chronic Lyme Disease, Attention Deficit Hyperactivity Disorder (ADHD), Functions of the immune system, Digestive, Neurological, Brain, Circulatory, and Endocrine. The major life activities substantially limited by these conditions are seeing, sleeping, walking, standing, learning, reading, concentrating, thinking, communicating, and working. (ROI 531-533).
>
> Ms. Walker's medical conditions substantially limit her ability to perform the essential functions of her job as a Public Health Training Coordinator. The medical documentation suggests that Ms. Walker's limitations are **variable and intermittent, exacerbated during flare-ups or periods of fatigue.** (ROI 531-533).
>
> FOH recommends implementing the requested accommodations, if administratively feasible, and assessing Ms. Walker's ability to perform the essential functions of her job with or without accommodation.

44. Dr. Walker successfully performed the duties of her position, with or without the reasonable accommodation. Jennifer Webb testified during a deposition in the administrative hearing as follows:

> Q. [By Plaintiff's Counsel]   Okay, all right, so what -- with regards to Ms. Walker, if you had to describe her best qualities with regards to the performing the duties of her position, what would you say her best qualities are with regards to performing the duties of her position?
>
> A. [Jennifer Webb]   I do think she does very good with her delivery.  She comes out very polished and a good presentation style.  She cares about making sure that people understand, you know, whatever she's presenting, and -- and she takes the time out to answer the questions.
>
> Q   And you -- her knowledge level with regards to -- her knowledge level with regards to the information, you're satisfied with that?
>
> A   Yes; generally, she's knowledgeable about the subject that she's teaching.
>
> Q   Okay, with regards to student -- student feedback and things like that, evaluations, they're normally positive with regards to Ms. Walker?
>
> A   Yeah, I don't -- I don't remember any terrible complaints or anything like that.  Generally, I didn't have an issue with her feedback.
>
> Q   Okay, so as far as her classroom presentation, that's fine.  That's at the level. That's at least at the level that you would expect her to be for someone in her position?
>
> A   Yeah, the only issue I had with the import class was attendance or, you know -- but when she's there, it's fine.
>
> Q   Okay, anything else with regards to the -- .., I'm talking about her best qualities.  I don't want to miss one.  Is there anything else that if you were telling somebody her best qualities with regards to the performance of her duties or position, is there anything else?
>
> A   No, no, I get feedback from the other branch chief and that she's knowledgeable about the topics and PHV dispositions.  That -- that's -- I think those are her strengths.
>
> Q   What is PHV disposition?
>
> A   Public health veterinarians, I think she knows animal diseases.
>
> Webb, Jennifer - Vol. I, (Pages 35:8 to 37:9)

45.   Likewise, with regards to the specific performance during the 2020 time frame, Colete Mayfield, who was Dr. Walker's Team Lead,  recognized Dr. Walker's great performance of the duties of the position. In her affidavit Mayfield states that

"Plaintiff is knowledgeable, dependable, produces quality, work, and goes above and beyond."  She also states that :

> The Complainant and I have worked together since 2017 and were originally coleads/ gatekeepers for the Further Processing and Labeling course. Management decided they only wanted one team lead for each course, so they decided that I would be the Team Lead and allow Complainant to continue teaching this class. Then, in 2020, they appointed a gatekeeper as a secondary position to assist me in leading the team. They did not choose Complainant for this position, but instead chose someone who had been teaching this class less than one year and had worked as a trainer less than 2 years. This person had considerably less experience as a trainer and particularly with this very technical course. No reason was given for their choice.

46. Dr. Walker's proficiency in performing the duties of her position are also stated in the September 20 2020 performance review.  The comments directly from the review are as follows:

> Andrea learned new technology to communicate with class participants via Microsoft Teams. She conducted her work meetings in Teams to improve engagement and give more constructive feedback/discussion to make our meetings more effective and efficient. Andrea's oral communication as an instructor is effective during training.
> To exceed in this element, Andreas can continually inform the supervisor and senior management of sensitive or controversial emerging issues and offers well thought-out recommendations to prevent and/or respond to developing problems. She can also be more available to communicate and respond to workgroup members.
>
> Andrea has been successful in building partnerships with all staff members. As a result of coordinating staff training schedules and workplans, she contributed to the staff's ability to meet the needs of our customers and stakeholders. She also has participated in helping to modify and improve multiple projects including the following:
>     Virtual Inspection Methods (Team member)
>     Virtual Further Processing and Labeling Inspection Course (Team Member)
>     Virtual Public Health Veterinarian Mentor Course (Editor)

> Virtual Ready-to-Eat/Shelf Stable Inspection Course (Course Manager)
> Training as a Condition of Employment Directive update (Lead)

She has communicated with subject matter experts (SMEs) and other instructors on several occasions, to get feedback and suggestions for various projects. For example, in order to update and revise the TCOE directive, she communicated with SMEs to get clarity on policy changes for the on-boarding process and what needed to be updated for the draft to include the requirements for the new virtual training.

As a result of communicating with various individuals, Andrea was able to complete her work. She has also coordinated meetings with other SMEs for discussion on topics pertaining to her projects. Her workgroups have communicated consistently and have successfully developed a support network that staff can use as needed. To exceed this performance element, Andrea can provide SMEs with more advance notice of requested tasks and also involve SMEs feedback during the initial content revisions and course updates.

As a Further Processing and Labeling Inspection course team member, Andrea reviewed information pertaining to the formulas and calculations, ensured that it was accurate and then further researched the data to determine if the calculations could be simplified to better meet the needs of the participants. The participants were able to use the electronic version of the calculations created in Microsoft forms to complete the required exercises to receive credit for participating in the training. There were minimal revisions needed for clarification at the conclusion of the first virtual class.

By converting the workshops and exercises in Microsoft forms, the team was able to use the features to assign points to each question, grade each document submitted by the participants and compile end of class reports to show how the participants scored on the exercises, workshops, and quizzes.

To exceed this performance element, Andrea can increase her individual contributions to the team by producing analytical reports and evaluations that can be used increase training proficiency.

During FY20, as the course manager of the Virtual Ready-to-Eat/Shelf Stable Inspection Course, Andrea converted existing Inspection Methods training materials into modules in Moodle to develop an independent standalone course. She recorded voiceovers that played narratives on the topics on the slides to her assigned modules.

She implemented, with supervisory guidance, student exercises in the modules that allowed the participants to "check" their knowledge gain after they finished completing the modules. All mandatory annual training have been completed prior to the deadlines.

47. Moreover, the evaluations performed by the students also reveal Dr. Walker's proficiency. The "VRTESS 1900" is a course that was taught by Dr. Walker. The Evaluation Data Analysis for that course revealed that "the highest satisfaction score was 92% for survey question #4 "How satisfied were you with the instructor's overall teaching performance."

48. Section 504 of the Rehabilitation Act provides, in relevant part that: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability" be subject to discrimination with regard to federal employment. 29 U.S.C. § 794(a) (2006).

49. The Agency has engaged in the very conduct that is made illegal by the specific provisions of the Rehabilitation Act. The actions of the Agency in refusing to provide Dr. Walker with an effective reasonable accommodation of flexible dates, telework, Maxiflex and deadline extension, as well as repeated incidents of unwarranted discipline, the demonstration opportunity, and the failed attempt to remove plaintiff from employment with FSIS, as well as the refusal to award her a monetary award, are acts of discrimination, harassment and retaliation that occurred because of her disability.

50. Plaintiff was an individual with a disability within the meaning of the Rehabilitation Act, the employer had notice of her disability; with reasonable

accommodations plaintiff could perform the essential functions of the position; and her employer refused to make reasonable accommodations.

51. At all times relevant to her complaint plaintiff had a physical or mental impairment which substantially limits one or more of her major life activities. Plaintiff has a record of such an impairment or was regarded as having such an impairment.

52. Management engaged in persistent and continuous conduct in retaliation for Plaintiff exercising her right to be from the discriminatory conduct of management.

53. The persistent, pervasive, mean, hateful, and retaliatory actions were directed at Plaintiff in retaliation for exercising her rights under the Rehabilitation Act.

54. The retaliatory conduct of the defendant violates the provisions of the Rehabilitation Act's prohibition against retaliatory employer conduct.

55. The defendant's conduct as described herein violates the Rehabilitation Act. The defendant's conduct as described herein is in retaliation for plaintiff's complaints of disability discrimination.

56. The defendant has discriminated against Plaintiff because of her disability.

57. As a result of the defendant's illegal actions, plaintiff has suffered lost wages, mental pain and anguish, and loss of health benefits and other benefits.

58. Plaintiff demands trial by jury.

Wherefore, plaintiff prays the court that the court grants the following relief to plaintiff:

        A.    Compensatory damages in an amount of 300,000.00 dollars;

        B.    Punitive damages in an amount to be determined by a jury;

      C.      Reimbursement of any costs incurred as a result of the defendant's actions;

      D.      Attorney's fees;

      E.      Back pay, benefits, seniority, promotion and/or front pay;

      F.      Trial By Jury;

      G.      For such other and further relief as the court deems appropriate.

This the 14th day of September 2022.

Ralph Bryant Law Firm
/s/ Ralph T. Bryant, Jr.
Ralph T. Bryant, Jr.
(N.C. State Bar No. 18119)
*Physical Address*:
  313 Clifton St., Suite F Greenville, N.C. 27858
*Mailing Address*:
  P.O. Box 723  Newport, North Carolina 28570
Phone (252) 626-3267
Fax   (252) 294-1624
ralphbryant@ralphbryantlawfirm.com